IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| MIKE HILLENGA and SHERI HILLENGA, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 170035G |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiffs appeal from adjustments to deductions claimed on their 2009 income tax return

for Schedule C and Schedule A expenses. At trial, Plaintiff Sheri Hillenga (Mrs. Hillenga)

appeared and testified on Plaintiffs' behalf. Darren Weirnick, Senior Assistant Attorney

General, appeared on Defendant's behalf, and Matthew Derby, auditor, testified on its behalf.

Plaintffs' Exhibits 1 to 11, pages 1 to 37 of Exhibit 12, and Exhibits 14, 15, 17, 18, 20, 21, and

23 were admitted at trial.[1] Defendant's Exhibits A to Q, S to V, and BB were also admitted.

## I. EXHIBIT-RELATED MOTIONS

A. *Protective Order*

At trial and in their first post-trial brief, Plaintiffs moved for "a protective order and

return of certain exhibits." (Ptfs' Closing Statements at 1.) The "certain exhibits" identified are:

a travel timeline and country list Plaintiffs prepared for trial; customer purchase orders; supplier

invoices and a letter confirming payments; other letters and emails; a military report marked

"Approved for public release; distribution unlimited"; articles from various web pages,

newspapers, and journals; photographs; a marketing brochure; and a blank order form. (*Id*.)

---

[1] Defendant did not receive pages 12 to 16 of Exhibit 1, but dropped its objection to their admission when informed those pages were identical to pages 15 to 19 of Exhibit 4.

Plaintiffs request that those exhibits "*not* be posted on the Internet or the information be revealed." (*Id*.) Plaintiffs claim the documents contain "confidential contacts and pricing," which would put them "completely out of business" if obtained by their competitors. (Ptfs' Post-Trial Memo at 4.)

Defendant objects to a protective order, arguing that the documents in question either contain "stale" information or else are already publicly available.

The court has authority to issue orders protecting the confidentiality of certain classes of documents and the information they contain. ORS 305.430(3) (2017).[2] Two conditions must be met: (1) the documents must be "confidential business records, tax returns or documents containing trade secrets"; and (2) the prospective harm to the disclosing party must outweigh "any benefit received by the public as a result of the disclosure." ORS 305.430(3).

While ORS 305.430(3) does not define either "business records" or "trade secrets," definitions of those terms are found in the Oregon Evidence Code (OEC) and the Oregon Uniform Trade Secrets Act.[3] Those statutory definitions provide useful context for understanding the terms as used in ORS 305.430(3).

OEC 803(6) is known as the business records exception to the rule against admission of hearsay, and covers the following records:

> "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation[.] * * *."

---

[2] Unless otherwise indicated, the court's references to the Oregon Revised Statutes (ORS) are to 2007.

[3] Located at ORS 40.010 to 40.085 and ORS 646.461 to 646.475, respectively.

Because business records must be made according to regular practice, correspondence and other "isolated memoranda" are not generally considered business records. *Scanlon v. Hartman*, 282 Or 505, 511, 579 P2d 851 (1978).

ORS 646.461(4) defines trade secrets as follows:

" 'Trade secret' means information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:

"(a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

"(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Whether information is a trade secret is a question of fact. *Kaib's Roving R.PH. Agency, Inc. v. Smith*, 237 Or App 96, 103, 239 P3d 247 (2010). Lists of customers and contacts can be trade secrets where considerable time and money have been spent assembling them, but not where a product's principal consumers can be quickly identified using publicly available information or where contact names are relatively few and can be obtained simply by calling their companies. *IKON Office Solutions v. American Office*, 178 F Supp 2d 1154, 1167–68 (D Or 2001), *aff'd*, 61 Fed Appx 378 (9th Cir 2003), *cited in Kaib's Roving R.PH. Agency*, 237 Or App at 102–03. Pricing and cost structure information can be a trade secret where it is not commonly known in the industry. *See id.* at 1169–70.

The evidence adduced at trial tends to show that Plaintiffs' Zoex activity involved selling a highly specialized product to a niche market and that Plaintiffs identified potential customers by spending an extraordinary amount of time and money traveling the world. There is no evidence of how Plaintiffs' cost structure and pricing have changed since the year at issue. Under those facts, their contact, pricing, and cost information qualify as trade secrets potentially

protectable under ORS 305.430(3).  Among the documents in question, the following either are confidential business records or contain trade secrets: the purchase orders and invoices, which are business records that contain pricing and cost information; the timeline, which partially identifies prospective customers and contacts; and the supplier letter, which contains cost information.  The published articles, photographs, correspondence, and other documents are neither business records nor tax returns; they contain no trade secrets and cannot be subject to a protective order.  *See* ORS 305.430(3).

Before issuing a protective order, the court must "weigh the harm suffered by the disclosing party against any benefit received by the public as a result of the disclosure." ORS 305.430(3) (2017).  A taxpayer seeking a protective order must "show that disclosure would cause 'clearly defined and very serious injury.' "  *Lamb-Weston, Inc. v. Dept. of Rev.*, 11 OTR 448, 451 (1990) (quoting *United States v. International Business Machines Corp.*, 67 FRD 40 (1975)).  In some cases, the potential for injury decreases with the passage of time; *i.e.*, the information becomes "stale."  *See*, *e.g.*, *id*. at 452 (giving only limited confidentiality to potato-processing plant data from prior years).  The public benefit must be weighted against the injury foreseeable to the taxpayer.  *Id*. at 451.  In general, the public has a strong interest in the integrity of government processes, which is safeguarded by open access to court proceedings— even where "disclosures may be embarrassing and even harmful in some respects to the participants[.]"  *Union Pac. R. Co. v. Dept. of Rev.*, 10 OTR 235, 237 (1986).  However, where a document is neither used nor referenced at trial, the court has found that "the public benefit of disclosure is minimal."  *Level 3 Commc'ns, LLC v. Dept. of Rev.*, TC 5236, WL 2078573 at *3 (Or Tax May 10, 2019).

/ / /

In this case, Plaintiffs' 2009 costs of goods sold and travel expenses were squarely at issue. Because the 2009 documents were the most important evidence of product costs and travel purposes, the public interest in not prohibiting their disclosure is strong. To the extent those documents reveal decade-old contacts and pricing secrets, their age diminishes their usefulness to competitors and the potential for harm to Plaintiffs' business.

On the other hand, Plaintiffs' purchase orders were all for years other than 2009 and were submitted merely to demonstrate that they made sales in foreign countries. They were irrelevant to the issues in this case because the international scope of Plaintiffs' activity was never disputed. Because neither party relied on the purchase orders to prove any issue at trial, they hold only minimal public interest. Plaintiffs, in contrast, specified two of those purchase orders as revealing particularly sensitive pricing and customer information. (Ptfs' Post-Trial Memo at 4.)

In sum, relatively few of the documents for which Plaintiffs requested a protective order are either business records or documents containing trade secrets. Of those that are, the public benefit of allowing disclosure of the timeline, supplier letter, and invoices outweighs the risk of harm. Because the purchase orders found at pages 10, 11, 24, and 28 of Plaintiffs' Exhibit 1 were not relevant to the issues in this case and generate the most risk for Plaintiffs, the court orders them held under seal. Plaintiffs may timely arrange to have exhibits they submitted to the court returned to them according to the usual procedure after this case is closed.

B.    *Motion to Exclude*

Defendant moved to exclude additional exhibits that Plaintiffs attached to their first post-trial brief (their "Closing Statements"). Pursuant to Tax Court Rule – Magistrate Division (TCR–MD) 12 C(1)(a), "all exhibits must be either postmarked at least 14 days before the trial

date or physically received by the court and all other parties at least 10 days before the trial date."[4]  Not only were Plaintiffs' additional exhibits untimely, they were received after trial. Defendant had no opportunity to cross-examine Plaintiffs' witness on them or present its own rebuttal evidence.  The court grants Defendant's motion to exclude.

## II.  STATEMENT OF FACTS

In 2009, Plaintiffs engaged in three money-making activities.  While the parties do not agree whether the activities were all engaged in for profit, it is undisputed that Plaintiffs' revenue exceeded their expenses for each of the activities during the year at issue.  The first activity was a design-proposal firm called VMH Visuals (VMH).  In 2009, VMH had only one customer: a Palo Alto, California, company called "Space Systems/Loral."  The second activity was the marketing and distribution of a medical product known as the Zoex Non-Inflatable Anti-Shock Garment (Zoex garment).  The third activity was managing rental properties in the Ashland, Oregon, area.

Plaintiffs owned homes in Ashland, Oregon; Coloma, California; Iowa; and Italy. Plaintiffs maintained offices in both their Coloma and Ashland homes and traveled frequently between them.  Mrs. Hillenga testified that Plaintiffs chiefly conducted their VMH and Zoex activities from their Coloma home and that they managed their rental properties from Ashland. Plaintiffs deducted a home-office expense for business use of 83 percent of their Coloma home—approximately 2,500 out of 3,000 square feet.  (*Compare* Ex N at 14 with Ex 7 at 5.)

VMH oversaw the rapid preparation of design proposals.  Plaintiffs would begin a job by driving from Coloma to Palo Alto and meeting with their customer to review job requirements. They would then drive to their home in Coloma to process the paperwork.  (Ex 2 at 3–4.)  They

---

[4] An exception applies to rebuttal exhibits submitted during trial.  TCR–MD 12 C(1)(c).

outsourced the production work to a third party called LiveWire. LiveWire typically completed the work overnight while Plaintiffs remained available to solve problems that arose. (*Id.*) The next day, Plaintiffs would drive back to Palo Alto, deliver the completed project, and review it with their customer. (*Id.*)

Plaintiffs' Zoex activity involved extensive travel. Plaintiffs marketed the Zoex garment "by attending conventions around the world" and "[p]ersonally 'cold' calling on hospitals, doctors, clinics, fire departments, forestry departments, civil defense, military bases, the National Guard, ambulance companies, health departments, ski resorts, [and] air rescue[.]" (Ex 4 at 6.) They did not advertise beyond maintaining a web page. (*Id.*) Plaintiffs considered in-person demonstrations of the Zoex garment necessary to show its advantages over inflatable varieties of anti-shock garments. (*See id.*) When Plaintiffs received orders for Zoex garments, they had them produced in a Taiwan factory by a company called Perfectex Plus. Perfectex invoices dated January and February of 2009 showed a billing and shipping address for Zoex in Ashland. (Ex BB.)

Plaintiffs' 2009 travel involved short trips to Iowa and Pennsylvania, overseas travel to the United Kingdom, and two sojourns in Italy totaling nearly four months. Plaintiffs explained that on trips to Europe it took them "ten to fifteen days" to prepare for a presentation or demonstration, time that was spent adjusting to the time change, taking language refresher courses, and preparing materials. (Ex 4 at 2.) When traveling to Italy or Iowa, Plaintiffs usually stayed at the homes they owned in those locations. Their Iowa home was located in the same town where Mr. Hillenga's mother lived, and one trip there coincided with her birthday.

As documentation of a business purpose for their travels, Plaintiffs submitted a handwritten logbook kept on a 2009 calendar and a typed document, prepared in anticipation of

trial, interpreting and amplifying the handwritten logbook. (Ex 3.) During a close cross-examination regarding the handwritten logbook, it was revealed that the copy Plaintiffs provided to the court included annotations not present on the copy provided to Defendant. Plaintiffs explained the discrepancy as "a simple oversight" in that they had written notes on only one of the copies. (Ptfs' Closing at 6.) Plaintiffs also submitted a timeline that they prepared in anticipation of trial. (Ex 4 at 18–19.)

Plaintiffs held multiple personal and business bank accounts in 2009 with differing addresses. Of the two personal accounts for which statements were submitted, one was held under Plaintiffs' Coloma address and the other under their Ashland address. (Ex 17 at 1–9, 18–29.) Plaintiffs submitted statements for two relatively inactive VMH accounts showing their Coloma address. (*Id*. at 10–17.) Those accounts did not show deposits comparable to the revenue Plaintiffs reported for VMH. Plaintiffs' evidence included canceled checks from another VMH account for which bank statements were not provided. (*See*, *e.g.*, Ex 1 at 9.) Plaintiffs' address was not preprinted on those checks. Plaintiffs also submitted statements for a Zoex account. (Ex 18.) While Plaintiffs' Ashland address was preprinted on checks drawn upon that account, their bank statements showed their Coloma post office box. (*Compare* Ex 1 at 9 *with* Ex 18.)

Numerous receipts submitted for VMH and Zoex purchases and shipments showed an Oregon point of sale. For example, in support of their office supplies expenses, Plaintiffs submitted 11 receipts from the Costco in Medford, Oregon, compared with two receipts from the Costco in Folsom, California. (Ex 5 at 12, 14, 17, 19–22, 25–26.) Plaintiffs submitted seven receipts for services and purchases from a Medford computer center, compared with one receipt

/ / /

from the Folsom Best Buy. (*Id*. at 10, 12–13, 19, 24, 26–27.) Receipts for postage and other expenses showed a similar pattern of 2009 purchases predominantly in Oregon.

An online comment posted by Plaintiffs' authority on January 24, 2010, identified the Zoex address as Plaintiffs' Ashland post office box. (Ex Q at 21.) An undated Zoex business card similarly listed Plaintiffs' Ashland post office box. (*Id*. at 24.)

On their 2009 return, Plaintiffs claimed actual-expense deductions for three Cadillacs, a Ford Escape, a Chevrolet HHR, and an RV. (Ex 2 at 8.) They claimed current depreciation for four vehicles, reporting 100-percent business use of each. (Def's Ex N at 17–18.) Plaintiffs conceded there were no records of which vehicle they used for each of their trips.

Plaintiffs filed a single Schedule C for both their design-proposal activity and their Zoex-marketing activity, reporting income net of costs of goods sold (COGS) and various expenses. (Ex N at 9–10.) Plaintiffs reported income and expenses from their rental activity on Schedule E, but also included expenses from that activity on their Schedule C. (*Id*. at 11–12; *compare* Ex 1 at 1 *with* Ex N at 9.) Plaintiffs claimed Schedule A deductions for charitable contributions and medical expenses. (Ex N at 7.)

Defendant adjusted Plaintiffs' return, disallowing all of Plaintiffs' Schedule C expenses and COGS after Plaintiffs declined to provide documentation at audit. (*Compare* Ex F at 5 *with* Ex N at 9.) Defendant also disallowed Plaintiffs claimed Schedule A charitable contributions in full and their medical-expense deductions in part. (Ex F at 5.) Defendant made no adjustment to Plaintiffs' Schedule E.[5] (*See id*.)

/ / /

---

[5] Defendant also adjusted Plaintiffs' allocation of income based on California residency, finding they were Oregon residents in 2009. Although Plaintiffs disagree with that determination, they chose not to contest it.

Both parties modified their positions at trial.  Defendant, having had opportunity to review Plaintiffs' documentation for the first time, conceded some COGS, expenses, and Schedule A deductions.  Plaintiffs, for their part, signficantly *increased* the Schedule C expenses they had claimed on their return in an "updated" worksheet and Schedule C, which Defendant agreed to allow the court to consider.  The table below summarizes the amounts claimed on Plaintiffs' Schedule C, the updated amounts claimed at trial, and Defendant's concessions.

| Expense | Schedule C as Filed | "Updated" Schedule C | Defendant's Concession |
|---|---|---|---|
| COGS: | $98,462 | $98,462 | [$61,768] |
| LiveWire (VMH) | --- | $45,855 | $45,855 |
| Perfectex (Zoex) | --- | $52,608 | $15,913 |
| Car and Truck | $6,181 | $11,002 | --- |
| Depreciation | $26,308 | $26,308 | --- |
| Insurance | $355 | $355 | --- |
| Office | $10,852 | $17,471 | $425 |
| Supplies | $8,353 | $11,243 | $1,000 |
| Travel | $20,199 | $47,446[6] | --- |
| Meals & Entertain. | $4,072 | $1,823 | --- |
| Other: | $4,843 | $3,737 | [$312] |
| Accounting | $850 | $850 | --- |
| Bank Charges | $128 | $128 | --- |
| Postage[7] | $994 | $361 | $150 |
| Security | $348 | $348 | --- |
| Service Contracts | $747 | --- | --- |
| Telephone | $1,776 | $2,050 | $162 |
| Bus. Use of Home | $11,268 | $11,268 | --- |

(Ex N at 9; Ex 1 at 1–3; Def's Post-Trial Memo at 49.)  The table below summarizes the total medical expenses and charitable contributions claimed by Plaintiffs and conceded by Defendant:

/ / /

---

[6] Plaintiffs' worksheet claims an even higher amount: $58,797.91.  (Ex 1 at 1.)  The worksheet breaks out an expense for "Taxi" from the other travel expenses in its updated column, but includes that expense in total travel expenses in its original column.  (*See id*.)  Including the "Taxi" expense, the updated worksheet travel total would be $59,006.

[7] Plaintiffs' reported postage equals the sum of worksheet line items for postage and shipping.

|  | *Schedule A* | *Conceded* |
|---|---|---|
| Medical and Dental | $17,540 | $11,726 |
| Gifts to Charity | $15,570 | $2,475 |

(Ex N at 7; Def's Post-Trial Memo at 50.)

Additional evidence will be discussed where relevant to the analysis below.

### III.  ANALYSIS

The issues for decision are whether the evidence suffices to increase Plaintiffs' allowable COGS and their business, medical, and charitable deductions beyond the amounts conceded by Defendant.[8]  Those issues are governed by the Internal Revenue Code (IRC) because, subject to modifications, Oregon taxable income equals taxable income under the IRC.[9]  *See* ORS 316.022(6); 316.048.[10]

In all cases before this court, the burden of proof falls on the party seeking affirmative relief.  ORS 305.427.  Here, Plaintiffs seek affirmative relief because they have asked the court to order a change to their tax assessment.  Therefore, they may not obtain relief unless a "preponderance of the evidence" shows they are entitled to it.  *See id*.  Even if Defendant fails to show that another version of the facts is more probable than Plaintiffs', the tax assessment must stand if the evidence is in equipoise.  *See Hillenga v. Dept. of Rev.*, 21 OTR 396 (2014), *aff'd in part, rev'd in part*, 358 Or 178, 361 P3d 598 (2015).

/ / /

---

[8] In the last sentence of Plaintiffs' first post-trial brief—their Closing Statements—Plaintiffs assert that "it appears as though" Defendant did not consider their federal tax payment when calculating their Oregon tax liability. Such a statement, coming in a brief submitted after trial, does not suffice to raise a new issue.

[9] Plaintiffs are entitled to a subtraction from their federal adjusted gross income (AGI) under ORS 316.695(1)(d) for medical expenses not deductible due to the AGI threshold of IRC section 213(a).  Defendant does not dispute this, so there is no issue for the court to consider.  (*See* Def's Post-Trial Memo at 45.)

[10] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2007.

A.    *Zoex COGS*

Plaintiffs provided a letter dated March 2, 2017, signed by a vice president of Perfectex, and captioned "2009 paid checks confirmation." (Ex 1 at 17.) That letter lists the amounts of five checks as follows:

> "We, Perfectex Plus LLC are verifying the PAID accounts receivable for 2009 by Sheri Hillenga/ZOEX as follows:
>
> "$5,304.17
>
> "$10,608.33
>
> "$9,547.50
>
> "$9,547.50
>
> "$17,600.00
>
> "Total *$52,607.50* payments was made for 2009."

(*Id*. (Emphasis original.)) Defendant concedes the first two payments are allowable COGS, but disputes that the last three payments are allowable in 2009.

Available evidence of the disputed checks includes copies of two of the checks, a bank statement showing payment on a third, and a Perfectex invoice dated March 18, 2010. (Exs 1 at 18; 18 at 12; BB at 3.) The invoice reports an order date of January 4, 2009, on terms "COD/net 10." (Ex BB at 3.) The total of the order is $19,095, and two "received" stamps on the invoice show equal payments of $9,547.50 received November 4, 2009, and January 6, 2010. (*Id*.) The evidence associates up to three dates with each check: the date written on the check, the date Perfectex acknowledged receipt of the check, and the date the check cleared Plaintiffs' bank. That information is summarized in the following table.

/ / /

/ / /

| Check Number | Amount | Check Date | Received Date | Cleared Date |
|---|---|---|---|---|
| 155 | $9,547.50 | unknown | 11/4/2009 | 11/6/2009 |
| 262 | $9,547.50 | 10/29/2009 | 1/6/2010 | 1/8/2010 |
| 275 | $17,600.00 | 12/23/2009 | unknown | 1/8/2010 |

Plaintiffs' bank statement shows that check number 155 cleared well out of sequence; other checks clearing in nearby months were in the range of numbers 250 to 270. (Ex 18 at 11–13.)

Mrs. Hillenga testified that all orders from Perfectex were placed orally and that Plaintiffs kept no records of their sales or inventories. During her cross-examination of Defendant's witness, she stated that Plaintiffs did not manufacture Zoex garments until payment from Zoex's customers was made in full. She stated they paid Perfectex 50 percent in advance and the balance when they received the garments.

By definition, COGS are excluded from the incomes of merchandising and manufacturing businesses. Treas Reg § 1.61–3(a). Generally, businesses that offset COGS against sales revenue must track their inventories at the beginning and end of each year. *See* Treas Reg § 1.471–1. However, in lieu of tracking inventories, cash-basis taxpayers with revenue less than $1 million may exclude the cost of inventoriable items as COGS "in the year in which the taxpayer sells the merchandise or finished goods * * * or in the year in which the taxpayer actually pays for the inventoriable items, whichever is later." Rev Proc 2001-10, 2001-2 IRB 272, §§ 4.01–4.02.[11]

In general, payment by check occurs when the check is mailed or delivered. *DeGroat v. Dept. of Rev.*, TC 5322, 2019 WL 369166 at *4 (Or Tax Jan 29, 2019), *as amended* (Feb 11, 2019). The general rule presumes the check is delivered without restriction on when it can be

---

[11] Revenue Procedure 2001–10 was modified, amplified, clarified, and partly superseded dozens of times before it was obsoleted altogether by Revenue Procedure 2018–40. None of the modifications prior to the tax year at issue altered the provisions pertinent here.

cashed; if delivery is made on condition that the check be held, payment is not made until that restriction is lifted. *See Fischer v. Comm'r*, 14 TC 792, 802 (1950). Where a check is dated one year and cashed the next, the burden is on the taxpayer claiming a deduction to prove when the check was mailed or delivered. *DeGroat*, 2019 WL 369166 at *4.

In the present case, there is no evidence that check numbers 262 and 275 were mailed or delivered before the end of 2009. Given that neither check was cashed until 2010—and that the Perfectex invoice indicates check number 262 was delivered in January 2010—Plaintiffs have not carried their burden of proof on those two checks.

Because check number 155 was delivered and cashed in 2009, it will be deductible if Plaintiffs have shown that they sold the Zoex garments for which it was tendered by the end of the year. *See* Rev Proc 2001-10, § 4.02. Such evidence is limited because Plaintiffs did not keep purchase orders or other records of their sales to customers in 2009.

According to Mrs. Hillenga's unsworn statement, Plaintiffs' standard practice was to pay half of the cost of a Perfectex order in advance and half upon delivery, having already received payment from their customer. Plaintiffs do not appear to have followed such a practice on the order for which check number 155 was paid. The invoice shows an order date in January 2009, a first installment payment in November 2009, and a second installment in January 2010. The invoice itself is dated March 2010—over two months after the date the second installment was paid. The gap between the final installment and the invoice date is unexplained; it is possible the garments were not manufactured until after the second payment was made in January 2010.

Furthermore, the evidence does not show that Plaintiffs received payment from their customers for the invoiced Zoex garments. While Plaintiffs did deposit large amounts into their Zoex account in October and November 2009, there is no evidence tying those deposits to

Plaintiffs' customers. (Ex 18 at 11–12.) The limited evidence does not suffice to show a pattern of customer payments before payments to Perfectex; no similar deposit preceded Plaintiffs' initial payment on their previous order. (*Compare* Ex BB at 1–2 *with* Ex 18 at 2–4.) The evidence is not sufficient for the court to conclude when Plaintiffs received payment from their customers for the garments described in the March 2010 invoice. Because Plaintiffs have not proved they received payment by the end of 2009, their costs cannot be excluded from their 2009 income. *See* Rev Proc 2001-10, § 4.01–4.02.

B.      *Schedule C Expenses*

In general, taxpayers may deduct their ordinary and necessary business expenses. IRC § 162(a). Only expenses incurred while seeking profit are business expenses, but where a not-for-profit activity generates gross income its expenses may be deducted up to the amount of that gross income as if they were business expenses. IRC § 183(b)(2). Because Plaintiffs' activities all generated revenue exceeding their claimed deductions, it is immaterial whether they were engaged in for profit.

The deductibility of certain expenses—such as expenses for business use of one's home, for travel and meals, and for use of certain "listed property" such as automobiles, computers, and cellular telephones—are further limited by statute. *See* IRC §§ 280A, 274(d). The court will first address Plaintiffs' claims for those limited deductions, then Plaintiffs' claims for general business deductions under IRC section 162(a).

1.      *Business use of home*

On their 2009 income tax return, Plaintiffs claimed that 2,500 out of 3,000 square feet in their Coloma home was used regularly and exclusively for business. (Ex N at 14.) The portions of the home allegedly so used included closets, hallways, a bathroom, two rooms described as

offices, additional rooms described as conference rooms, an attached storage area, a separate storage building, and more. (Ex 7 at 5.) The house included an upstairs office with a separate entrance, not reachable from the interior of the rest of the house. (*Id*. at 6.) Photographs of the upstairs office taken in 2009 show that in contained nonbusiness-related personal belongings in addition to a desk with computers and files. (Ex P at 22.)

A deduction for business use of one's home is allowable only where the related portion of the home is "exclusively used on a regular basis—

> "(A) as the principal place of business for any trade or business of the taxpayer,
>
> "(B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or
>
> "(C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business."

IRC § 280A(c)(1). A location can only be a principal place of business "if there is no other fixed location of such trade or business where the taxpayer conducts substantial administrative or management activities of such trade or business." *Id*. Expenses related to portions of the home used regularly for inventory storage are also deductible, "but only if the dwelling unit is the sole fixed location" of the taxpayer's trade or business. IRC § 280A(c)(2).

Here, although Plaintiffs apparently performed work at the Coloma house, the evidence shows they also used other addresses for carrying on their businesses. They spent significant amounts of time in Ashland and Italy, and they used their Ashland post office box as a mailing address for all their businesses. Receipts and checks put forward as proof of business expenses showed Plaintiffs made many purchases in Oregon using accounts for both VMH and Zoex. Invoices from Perfectex listed Ashland as Plaintiffs' shipping address for Zoex garments.

Plaintiffs had reasons for using their Ashland address, including concerns about the reliability of mail delivery in Coloma and shopping opportunities in the vicinity of their rental properties. While those might be good business reasons for conducting some administrative work from Ashland instead of Coloma, they do not alter the conclusion that a substantial amount of work for VMH and Zoex was done in Ashland. Plaintiffs have not proved that Coloma was the principal place of business for either their VMH or Zoex activities. *See* IRC § 280A(c)(1)(A).

Subparagraph (B) is inapplicable here. No evidence shows that Plaintiffs met clients or customers in Coloma "in the normal course" of their business; to the contrary, the evidence shows Plaintiffs typically traveled to meet their clients and potential customers.

Plaintiffs claimed two storage areas at their Coloma house: a 600-square-foot interior storage room, and a 180-square-foot "separate storage [building]." (Ex 7 at 5.) A diagram of the house does not show a separate storage building. (*Id*. at 6.) The evidence contains a single photograph of boxes labeled "storage," but it is dated in 2012 and it is unclear whether that photograph depicts the room or a separate building. (Ex 7 at 12.) The evidence of the storage building's existence and use is therefore insufficient for the court to determine that it meets the requirements of IRC section 280A(c)(1)(C), particularly given that the shipping address for Zoex garments found on the Perfectex invoices was Ashland, not Coloma. (Ex BB.) Expenses relating to the in-house storage room cannot be deducted because Coloma was not the "sole fixed location" of Plaintiffs' businesses. *See* IRC § 280A(c)(2).

2.      *Deductions subject to IRC section 274(d)*

Plaintiffs claimed deductions for several items subject to the heightened substantiation requirements of IRC section 274(d). IRC section 274(d) (2014) states, in pertinent part:

/ / /

"No deduction or credit shall be allowed—

"(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

"(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity,

"(3) for any expense for gifts, or

"(4) with respect to any listed property (as defined in section 280F(d)(4)),

"unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility or property, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility or property, or receiving the gift. * * *."

Plaintiffs' deductions for travel and meals must meet the heightened substantiation requirements. *See* IRC § 274(d)(1), (2). Because passenger automobiles, computers, and cellular telephones were all "listed property" in 2009, Plaintiffs must also meet the heightened substantiation requirements to deduct expenses for their use. *See* IRC § 280F(d)(4) (2002); IRC § 274(d)(4).

The "adequate records" of IRC section 274(d) must include "an account book, diary, log, statement of expense, trip sheets, or similar record" made at or near the time of the expenditure or use. Treas Reg § 1.274–5T(c)(2). For lodging expenses and most expenses of $75 or more, the records must also include "documentary evidence, such as receipts, paid bills, or similar evidence." Treas Reg § 1.274–5(c)(2)(iii). Taxpayers whose records are inadequate may reconstruct a log and provide other corroborative evidence, but both the reconstructed log and other evidence "must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure or use supported by sufficient documentary evidence." Treas Reg § 1.274–5T(c)(1).

Plaintiffs' central record of their activities was their handwritten "logbook," kept on a 2009 calendar. (Ex 3 at 1–12.) Handwritten entries in the logbook signified Plaintiffs' general location on each day (e.g., California or Oregon), appointments, flight information, and, in 20 instances, travel to make pickups or deliveries for Space Systems/Loral. (*Id*.)

During cross-examination, it emerged that the copy of the handwritten logbook provided to the court contained an entry of an appointment not found in the copy provided to Defendant. (Ex 3 at 11, entry for Nov 19.) Plaintiffs explained that the note added to the logbook and another alteration to a receipt were "simple errors" and that "nothing was intentional." (Ptfs' Closing Statements at 6.)

When the fact was revealed during cross-examination, Plaintiffs admitted that they had altered their logbook it in preparation for trial. Alteration of evidence is a serious matter, and may support a finding of fraud in some cases. *See Said v. Comm'r*, 85 TCM (CCH) 1353 (2003), *aff'd*, 112 Fed Appx 608 (9th Cir 2004). There is no accusation of fraud in the present case, and the additional notes found in the logbook and on a few other documents could have at most a marginal effect on Plaintiffs' tax liability. The court accepts Plaintiffs' explanation that they did not intentionally provide different versions of the document to the court and Defendant.

Nevertheless, the alteration demonstrates that the logbook in the form presented to the court was not prepared "at or near the time" of Plaintiffs' activities in 2009. *See* Treas Reg § 1.274–5T(c)(2)(ii). Plaintiffs altered their logbook after preparing copies for Defendant in 2019. The court has no way of determining to what extent they altered it before preparing those copies. Even assuming their alterations were meant to explain and not to conceal, the fact they were done discredits the logbook as a contemporaneous document. The court will treat the

/ / /

logbook as Plaintiffs' subsequent statement, made "when generally there is a lack of accurate recall." *See* Treas Reg § 1.274–5T(c)(1).

Lacking a contemporaneous log, Plaintiffs have not met the "adequate records" requirement of IRC section 274(d). *See* Treas Reg § 1.274–5T(c)(2). Thus, they can only meet the heightened substantiation requirement if they provide "sufficient evidence corroborating the taxpayer's own statement." IRC § 274(d).

a.      Car and truck expenses

Plaintiffs claimed deductions of their actual costs for 100-percent business use of three Cadillacs, a Chevrolet HHR, a Ford Escape, and an RV. (Ex 2 at 8.) Although additional vehicles are listed on their depreciation schedule, Mrs. Hillenga testified that Plaintiffs' only additional vehicles were another motorhome (undriven in 2009) and two Vespa scooters. (*See* Ex N at 17–18.) Plaintiffs kept no record of which vehicle they drove for each of their trips.

Plaintiffs have not provided corroborating evidence for all elements of their car and truck expenses. While receipts were provided for some repairs and purchases, no evidence of the times and places of vehicle use supports what is stated in the altered logbook. *See* IRC § 274(d). Nor have Plaintiffs substantiated the business purpose of their automobile use; their assertion that they drove no personal miles on any of their vehicles is not credible, and they have not provided corroborating evidence of business use on which the court could base an allocation. *See id*. Because Plaintiffs have not satisfied IRC section 274(d), no deduction is allowed either for their actual car and truck expenses or their automobile-related depreciation.

b.      Depreciation of listed property

Plaintiffs' depreciation deduction included depreciation of vehicles and computers. (Ex N at 22–24.) As Plaintiffs have not substantiated the business use of their vehicles, no

depreciation may be allowed. Plaintiffs submitted no log or other evidence of the business use of their computers, relying on their statement that "[a]ll of the computers are utilized for business purposes." (Ptfs' Post-Trial Memo at 21.) Plaintiffs allege the computers are entirely used for business, asserting they work "7 days a week, day and night, often 12 to 20 hours." (*Id.*)

An assertion that all computers within one's home are devoted exclusively to business use is dubious on its face. *See Larkin v. Comm'r*, 113 TCM (CCH) 1239 (2017) (so finding). Absent evidence on which to allocate business and personal use of the computers, Plaintiffs have failed to meet the requirements of IRC section 274(d). *See id.* They have not shown they are entitled to depreciation for any of their listed property.

    c.  Travel

Plaintiffs traveled extensively in Italy and Europe, and made additional trips to Pennsylvania and Iowa. They allege that all of those travels—even travel to their mother's home town on her birthday in conjunction with other family members—were for business. In their post-trial memorandum, Plaintiffs assert that "[t]he majority of time spent in Europe is work related." (Ptfs' Post-Trial Memo at 12.) By implication, some of that time was therefore not work-related.

Plaintiffs have provided some receipts and flight itineraries, but no corroborative evidence sufficient to distinguish business travel from personal travel—no records of where, when, or with whom they held their European meetings. Apart from the statements Plaintiffs prepared in anticipation of trial, they presented only a few photographs of uncertain date from trade shows. When confronted with her alteration of the logbook, Mrs. Hillenga mentioned that Plaintiffs kept another logbook while in Italy; the Italian logbook was not offered into evidence. Plaintiffs have not met the requirements under IRC section 274(d) to deduct travel expenses.

d.       Meals and entertainment

Plaintiffs' evidence of meals expenses is limited to receipts, large portions of which are illegible in the copies provided to the court.  (Ex 4 at 76–90.)  Many of the receipts contain some form of handwritten annotation: a letter representing Zoex or Plaintiffs' rental management activity; or a calculation of a dollar amount.  A few contain words, some illegible, some discernable as "gift."  Two bear the name of Plaintiffs' accountant and a reference to an audit.  Of those last two, one lacks a complete date and the other lacks a complete total.

It is unclear when Plaintiffs annotated the receipts.  Even if it was done contemporaneously with each expense, the annotations are insufficient to substantiate the business purpose and persons benefited, with the possible exception of the two meals with Plaintiffs' accountant.  Given Plaintiffs' demonstrated willingness to add notes to the evidence, however, the court treats the annotations as Plaintiffs' present statement of their recollection rather than as corroborating evidence.  Plaintiffs have not substantiated the elements required to deduct meals and entertainment expenses.  *See* IRC § 274(d).

e.       Cellular telephone

Plaintiffs provided cellular telephone statements, but did not offer any testimony on the telephones' usage and did not provide any corroborating evidence of their business purpose.  (Ex 9 at 17–22.)  They have not satisfied the requirements of IRC section 274(d).

3.       *Other deductions under IRC section 162(a)*

Although the substantiation requirements for other deductions under IRC section 162(a) are not as strict as those subject to IRC section 274(d), taxpayers remain responsible for "maintain[ing] all records that are necessary to a determination of the correct tax liability" and providing them to the Department of Revenue during an audit.  OAR 150-314-0265(2)(a); 150-

314-0267.[12]  Where there is evidence that deductible expenses were incurred, the court may estimate the amount of those expenses, "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making."  *Cohan v. Comm'r*, 39 F2d 540, 544 (2d Cir 1930). However, the court "must have some basis on which an estimate may be made."  *Vanicek v. Comm'r*, 85 TC 731, 743 (1985).

> "[T]he basic requirement is that there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose.  Until the trier has that assurance from the record, relief to the taxpayer would be unguided largesse."

*Williams v. United States*, 245 F2d 559, 560 (5th Cir 1957); *see also Scott v. Dept. of Rev.*, TC 5192, WL 1884627 at *5 (Or Tax Apr 19, 2018).

### a.     Additional Schedule C Depreciation

Excluding depreciation incorporated into their deduction for business use of their home, Plaintiffs claimed $26,308 in depreciation deductions on their Schedule C and did not change that claim in their "updated" Schedule C at trial.  (Exs N at 9, 1 at 2.)  Of that amount, $16,667 was claimed for depreciation of listed property—the vehicles and computers discussed above.  (Ex N at 16.)

The evidence does not fully identify the sources of the remaining $9,641 of depreciation claimed.  Plaintiffs' depreciation schedule reports a total of $20,278 in current depreciation.  (Ex N at 27.)  Of that amount, $5,785 pertains to Schedule E rental properties—not at issue—and $6,334 pertains to automobiles and computers, discussed above.  (*Id*. at 22–27.)  That leaves $8,159 of additional depreciation.  The largest portion—$7,435—is for improvements to a well, irrigation system, security fence, and office addition for the Coloma property.  (*Id*. at 23.)

---

[12] Oregon Administrative Rules (OAR)

Another $480 is for unspecified "buildings." (*Id*.) $170 is for a "storage area" improvement. (*Id*. at 27.) The final $74 is for "office furniture." (*Id*. at 23.)

Depreciation for improvements to the Coloma house and the storage area pertain to the business use of that home; a deduction cannot be allowed for the reasons discussed above. With respect to depreciation claimed for other buildings and for office furniture, there is no evidence of the buildings' business purpose and no evidence on which the court can estimate Plaintiffs' basis in any of those properties. Absent such evidence, Defendant's disallowance of the deduction is sustained. *See Vanicek*, 85 TC 731 at 743.

> b.  Insurance

Plaintiffs claimed $355 in insurance expenses on their Schedule C and did not change that claim in their "updated" Schedule C at trial. (Exs N at 9, 1 at 2.) Their exhibits included a portion of a $355 billing statement for a "Personal Liability Umbrella Policy" addressed to Plaintiffs personally at their Ashland address. (Ex 6 at 2.) The business purpose of that expense is not evident from the face of the document, and Plaintiffs offered no testimony as to its business purpose. Defendant's disallowance of the deduction is sustained.

> c.  Office expenses

Plaintiffs claimed $10,852 in office expenses on their Schedule C and increased their claim to $17,471 in their "updated" Schedule C at trial. (Exs N at 9, 1 at 2.) Plaintiffs submitted several pages of documents, including several duplicative documents, in support of their claimed office expenses. (Ex 6.) Several of those documents pertain to meal, travel, or computer expenses, which cannot be allowed because the requirements of IRC section 274(d) are not met, as discussed above. (*Id*. at 9–11, 13–14, 16, 18–19, 27, 29–35, 38–40.) Additional documents pertain to accounting and shipping expenses, discussed below. (*Id*. at 23, 27–28, 30, 36–43.)

The remaining documents include: credit card statements with line items reading "Amazon.com merchandise", "Costco.com online merchandise", and "Costco member renewal" marked; a post office box service fee notice in the amount $56; receipts from TJ Maxx with line items reading "Kitchen Acc", "Lingerie Fashn", "Giftware", "Floor Décor", "Décor Access", "Stationery", and "Gourmet Food" marked; an offer for a discounted subscription to Forbes magazine; a dry cleaning bill for a pair of trousers; receipts from a Pennsylvania bookstore for books, pens, a polo shirt, and a tote bag; a receipt from the Oregon DMV for the renewal of Mrs. Hillenga's driver's license; a receipt from Costco with a line item reading "Nikon S210" circled; mostly illegible receipts from the Coloma post office and the Ashland Bi-Mart; a statement showing a $211 purchase from a printer and a packing slip of like date itemizing 100 booklets for Zoex; two $19.99 Costco DVD order forms for "Zoex NIASG Instructions" and "Zoex NIASG History NASA"; a Sam's Club receipt for "Dig Camera" and "Grapenuts"; a nonitemized receipt from "Fisheries Supply" in Seattle; an invoice for security monitoring of Plaintiffs' Ashland home; and copies of some of Plaintiffs' canceled checks.

A few of the expenses claimed by Plaintiffs appear on their face to be for business purposes, especially the roughly $250 paid for printing and digitizing Zoex documentation. Some are clearly personal expenses, such as the driver's license renewal fee. Many others are items that might be for business or personal reasons, such as the merchandise purchased online. However, without testimony or further corroborating evidence, the court does not have the requisite assurance that those expenses were paid for business purposes. *See Williams*, 245 F2d at 560. Plaintiffs have not shown office expenses greater than the $425 conceded by Defendant.

/ / /

/ / /

d. Supplies

Plaintiffs claimed $8,353 in supplies expenses on their Schedule C and increased their claim to $11,243 on their "updated" Schedule C at trial. (Exs N at 9, 1 at 2.) Plaintiffs offered several pages of documents to support their claimed supplies expenses. (Ex 5 at 9–27.) Several of those documents pertain to meal, travel, or computer expenses, which cannot be allowed because the requirements of IRC section 274(d) are not met, as discussed above. (*Id*. at 10–13, 15, 18–20, 23–27.) Others pertain to postage and shipping expenses, discussed below. (*Id*. at 17, 19.) The remaining documents mainly consist of receipts from major retailers with line items marked for tape, bowl cleaner, stationery, "accssrs/lugg", video cables, a newspaper, cards, "décor access", batteries, gloves, CDs and DVDs, software, paper, markers, tissue, "hotwaterunit", drain cleaner, toothpaste, "Uniden 1588", a pallet, mats, flowers, "elastics", a light bulb, firestarter shavings, vacuum bags, and a "security chest." Additionally, credit card statements were provided with line items marked for a publishing house and for the Home Depot.

As with most of Plaintiffs' claimed office expenses, it is impossible to tell from the documentation alone whether the above items were purchased for personal or business use. Without supporting testimony or other evidence of business purpose, Plaintiffs have not shown any of their claimed supply expenses are deductible. Nothing is allowed beyond Defendant's concession of $1,000.

e. Accounting

Plaintiffs claimed an $850 expense for accounting among the "other" expenses on their Schedule C and did not change that claim in their "updated" Schedule C at trial. (Exs N at 10, 1 at 3.) Plaintiffs' documentation includes their accountant's statement showing an $850

preparation fee and a copy of a check from VMH to their accountant dated February 23, 2010. (Ex 11 at 1.) Because their accounting fee was not paid before 2010, no deduction is allowable for 2009. *See* IRC § 162(a).

    f.  Bank charges

  Plaintiffs claimed a $128 expense for bank charges among the "other" expenses on their Schedule C and did not change that claim in their "updated" Schedule C at trial. (Exs N at 10, 1 at 3.) Plaintiffs' documentation of those charges consists of portions of a credit card statement and another list containing seven small-dollar charges for "international transactions" and a bank statement on which a $20 "outgoing wire fee" is marked—that last fee having been incurred the same day as a wire transfer to Wells Fargo Home Mortgage. (Exs 11 at 2, 17 at 18.)

  Plaintiffs' documentation does not suffice to prove the business purpose of the bank charges, and no testimony was offered to support it. To the extent the international transaction fees are connected with travel expenses, they are also subject to the strict substantiation requirements of IRC section 274(d). No deduction for bank charges is allowable.

    g.  Postage

  Plaintiffs claimed a $994 expense for postage among the "other" expenses on their Schedule C and reduced that claim to $361 on their "updated" Schedule C at trial. (Exs N at 10, 1 at 3.) In support of postage expenses, Plaintiffs submitted calculator tape tallies, canceled checks made out to postmasters, several small-dollar receipts from mailings at the Ashland and Coloma post offices, a receipt for a $60 payment for a post office box in VMH's name, and a bill for a $56 fee for a post office box in Mr. Hillenga's name. (Ex 10.) In addition, Plaintiffs' office and supplies exhibits contained some receipts for purchases of stamps and shipments via foreign mail and private express courier services. (Ex 5 at 17, 19; Ex 6 at 23, 27–28, 30, 36–41.)

While the post office box fee for VMH appears deductible, the evidence does not include invoices for product shipments or equivalent documentation of the business purposes of the other postage charges. Plaintiffs did not offer supporting testimony. They have not proved the business purpose of any postage expenditures beyond the $150 conceded by Defendant. No additional deduction is allowed.

h.      Security

Plaintiffs claimed a $348 expense for security among the "other" expenses on their Schedule C and did not change that claim in their "updated" Schedule C at trial. (Exs N at 10, 1 at 3.) Among their documentation of office expenses was an invoice from Stanley Security Services for $348 in "monitoring charges" for their Ashland home. (Ex 6 at 32.) The court's copy of that invoice contains a handwritten note that it was paid on December 28, 2009. No canceled check or bank statement was provided. Lacking both testimony to support the business purpose of the expense and corroborating evidence of payment, Plaintiffs have not carried their burden of proof.

i.      Telephone

Plaintiffs claimed $1,776 in telephone expenses among the "other" expenses on their Schedule C and increased that claim to $2,050 on their "updated" Schedule C at trial. (Exs N at 10, 1 at 3.) In support of that claimed expense, Plaintiffs submitted portions of cellular and local home telephone bills. (Ex 9 at 4–29.) Bills for their Coloma house show two land lines at $13.50 each per month. (*Id*. at 4–15.) Bills for their Ashland house show a single land line. (*Id*. at 24–29.)

/ / /

/ / /

Under IRC section 262(b), "any charge (including taxes thereon) for basic local telephone service with respect to the 1st telephone line provided to any residence of the taxpayer shall be treated as a personal expense" and no deduction shall be allowed.

Here, Defendant has conceded a $162 telephone expense for 12 months of the second line at the Coloma residence. No deduction can be allowed for Plaintiffs' first home lines at each residence. *See* IRC § 262. Plaintiffs' cellular telephone expenses do not meet the substantiation requirements of IRC section 274(d), as discussed above. Therefore, no deduction for telephone expenses is allowable beyond the $162 conceded by Defendant.

C.    *Schedule A Deductions*

Defendant also adjusted Plaintiffs' claimed deductions for charitable contributions and medical expenses.

a.    Charitable contributions

Plaintiffs reported "cash or check" contributions to several charities totaling $15,570 on their Schedule A. (Ex N at 7, 21.) Plaintiffs documented some of their contributions with canceled checks, correspondence from charities, and receipts for purchases from retailers annotated "gifts." (Ex 12 at 28–32.) Plaintiffs also included acknowledgments from a church of noncash donations totaling $817.45. (Ex 12 at 33–35.)

IRC section 170(a)(1) (2008) allows deductions for charitable contributions, provided that the contributions are "verified under regulations prescribed by the Secretary." Those regulations provide that a canceled check is sufficient documentation of a cash contribution under $250. Treas Reg § 1.170A–13(a)(1). Cash or noncash contributions equal or greater to $250 must be verified by a contemporaneous written acknowledgment from the recipient that identifies whether and to what extent goods or services were provided in exchange for the

donation. IRC § 170(f)(8). The requirement for a contemporary written acknowledgment is "strict." *Oatman v. Comm'r*, 113 TCM (CCH) 1078 (2017).

Here, Plaintiffs may be allowed deductions where there is a proper acknowledgment letter from a charitable recipient or a canceled check under $250. The court's tally of such evidence does not exceed the $2,475 conceded by Defendant. Plaintiffs' canceled checks above $250 do not satisfy the regulation without a written acknowledgment. Much of Plaintiffs' other documentation consists of receipts for retail purchases; standing alone, those do not satisfy the regulation. Plaintiffs also provided a portion of a hospice's acknowledgment of in-kind donations; however, it does not substantiate a gift from Plaintiffs in 2009 because neither the date nor the donor of the gift is visible. No deduction beyond Defendant's concession is allowed.

b.      Medical expenses

Plaintiffs reported $17,540 in medical and dental expenses on their Schedule A. (Ex N at 7, 21.) Plaintiffs documented $15,462 of those expenses with invoices, canceled checks, receipts, and portions of insurance policy billing statements. (Ex 12 at 7–27.) Defendant concedes that $11,726 of the documented expenses were medical expenses, but contends that $3,485 of them were already allowed as a deduction on Plaintiffs' Form 1040.

Among Plaintiffs' itemized health care expenses was a $3,485 expense for long-term-care insurance premiums. (Ex N at 21.) Payment of those expenses was substantiated by four $1,223.75 checks with Plaintiffs' long-term care policy number in the memo line, in conjunction with a worksheet attributing $3,485 to Mr. Hillenga's coverage and $1,410 to Mrs. Hillenga's. (Ex 12 at 4, 27.) Plaintiffs claimed $3,485 as a self-employed health insurance deduction on line 29 of their Form 1040, and that deduction was allowed by Defendant. (*Id*. at 1.)

Medical expenses are generally deductible to the extent they exceed 7.5 percent of adjusted gross income. IRC § 213(a) (2004). In addition, taxpayers above a specified age may deduct their medical expenses up to 7.5 percent of adjusted gross income on their Oregon returns for the year at issue. ORS 316.695(1)(d).

The documentation is the only evidence of Plaintiffs' claimed medical expenses; they offered no testimony. During their cross-examination of Defendant's witness, Plaintiffs challenged Defendant's disallowance of checks to State Farm Insurance for $1,505 and $525.45. (Ex 12 at 27.) The top portion of the statement relating to the first of those payments was not provided, with the result that the nature of the policy purchased was not identified, and the policy number written on the memo line of the check did not match the policy number of any of the medical insurance statements provided. (*Id*. at 26–27.) No statement or key to the policy number written on the memo line of the other check was provided. Therefore, the evidence does not support a finding that those payments were made for medical as opposed to other insurance premiums. Documentation of the remaining disallowed medical expenses suffered from additional defects: lack of proof of payment; evidence a payment was made outside of 2009; illegibility or omission of a provider's name or a check's payee; or lack of proof of medical purpose, such as checks to Costco without accompanying receipts. Plaintiffs have not shown that additional expenses should be allowed beyond the amount already conceded by Defendant.

In its post-trial memorandum, Defendant argues that the $3,485 long-term-care expense was already allowed on Plaintiffs' 1040 and would be double-counted if it were also allowed on Schedule A. (Def's Post-Trial Memo at 45–46.) In their page-by-page rebuttal to Defendant's post-trial memorandum, Plaintiffs do not respond to that argument. (*See* Ptfs' Post-Trial Memo at 26.)

The burden of proof is Plaintiffs'. *See* ORS 305.427. While it is possible that Plaintiffs incurred two independent $3,485 medical insurance expenses in 2009, it is not probable without more evidence. Although Plaintiffs' omission of a response to Defendant's argument is not a concession, without any other explanation for the identity of the two numbers the court cannot conclude they are distinct expenses. $3,485 should therefore be subtracted from Plaintiffs' $11,726 of substantiated medical expenses. The result, as conceded by Defendant, is a deduction based on $8,241 in medical expenses.

## IV.  CONCLUSION

On the substance of their appeal, Plaintiffs failed to carry their burden of proving additional COGS and deductions beyond the amounts conceded by Defendant. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' request for a protective order is granted in part. Pages 10, 11, 24, and 28 of Plaintiffs' Exhibit 1 shall be held under seal by the court and by Defendant until they are either returned to Plaintiffs or destroyed.

IT IS FURTHER DECIDED that Defendant's motion to exclude exhibits attached to Plaintiffs' Closing Statements is granted.

IT IS FURTHER DECIDED that, as conceded by Defendant: Plaintiffs' COGs for VMH were $45,855 and for Zoex were $15,913; Plaintiffs are allowed business expense deductions of $162 for telephone service, $1,000 for supplies, $425 for other office expenses, and $150 for postage; and Plaintiffs are allowed Schedule A deductions based on $2,475 in charitable contributions and $8,241 in medical expenses.

/ / /

/ / /

/ / /

IT IS FURTHER DECIDED that Plaintiffs' appeal is denied as to all remaining issues.

Dated this ___ day of December, 2019.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on December 20, 2019.*